**SHEARMAN v. POE et al.  (No. 2213.)**

Court of Civil Appeals of Texas. El Paso. Sept. 27, 1928.

C. W. Croom, of El Paso, for appellant.

Eugene T. Edwards, Harrison & Scott, and J. E. Quaid, all of El Paso, for appellees.

WALTHALL, J. Appellee, Sam Watkins, brought this suit in the El Paso county court at law, alleging, in substance, that prior to the filing of the suit a certain Buick automobile worth $250, describing same, belonging to W. K. Lewis, was delivered to him, Watkins, at his place of business in El Paso; that appellant Shearman and appellee Lewis were each claiming title to said automobile, and each had notified him (Watkins) of such claim; that he does not know the rightful owner, or who is entitled to the possession of it; that he is a disinterested stakeholder, and there is no collusion between him and either of the defendants, and that he is ready, able, and willing, and desires, to deliver the automobile to the rightful owner, and tenders the same in court, and prays that Shearman and Lewis be cited to appear, answer, and interplead among themselves.

Shearman and Lewis each filed answer, Shearman claiming to own the automobile. Lewis answered that he owned the automobile at the time the suit was filed and had sold it to A. B. Poe. A. B. Poe intervened, claiming ownership of the automobile by purchase from Lewis. The case was tried before the court without a jury. The court heard the evidence and entered judgment in favor of Poe, to which Shearman excepted and prosecutes this appeal.

### Opinion.

The trial court filed findings of facts and conclusions of law, upon which the judgment is based. Appellant makes one assignment and submits it as a proposition. It is, in effect, that the undisputed evidence shows that Lewis sold and delivered the automobile to him (Shearman), and that such sale and delivery constitutes a transfer of title to him. Of course, if a completed sale and delivery had been made of the automobile at the time Poe bought from Lewis, Shearman would be the owner of the Lewis car, and should have judgment.

What constitutes an actual completed sale of personal property has often been stated by text-writers and the courts. It is not our purpose to enter into a general discussion of the subject of sales of personal property. As said by our Supreme Court in Woods v. Half, 44 Tex. 633:

"A careful examination will show that each case has been controlled by its own attendant circumstances. There is, however, one thing that courts have ever sought for, and, if found clearly and unmistakably, it has been of controlling force; that is, the intention of the parties."

It is often difficult to determine whether the facts show a completed sale or a negotiation about a sale. In Gay v. Hardeman, 31 Tex. 245, our Supreme Court, in discussing what constitutes an actual sale of personal property, says:

"It is an agreement between the seller and the buyer, upon the consideration or price, either in cash or upon a stipulated credit, and a delivery of the property. When so delivered, the sale is consummated, and the right of property becomes absolute in the buyer."

After stating what constitutes a sale of personal property by several text-writers, Simpkins, in his work on Contracts and Sales, at page 309, says:

"We see, then, from these definitions, that the essential idea of a sale is an agreement or meeting of the minds, by which an interest or title in a thing passes from one and rests in another for a consideration called price, or for property at a money value (referring to cases), and, if any one of those ingredients be absent, then it is no sale."

We see from the above that, to consummate a sale of personal property, there must be an agreement, a union of minds of the contracting parties: First, the intention common to each as to the thing to be done; second, proposal by one and an acceptance by the other. In Patton v. Rucker, 29 Tex. at page 408, it is said that it is not only necessary that the minds of the contracting parties should meet on the subject-matter of the agreement, but they must communicate that fact to each other, so that both may know that their minds do meet, and it is then only that the mutual assent necessary to a valid contract exists, and not until then that the contract is concluded. When the agreement as above has been entered into, when a physical transfer or delivery of the thing about which the agreement is made, the transfer or delivery of possession from one to the other effected, to perfect the sale, where such delivery is contemplated by the agreement, as to what shall constitute the delivery, in the absence of an express or implied agreement, the general rule is, as stated in Ellis v. Riddick, 34 Tex. Civ. App. 256, 78 S. W. 719, 723, the property is delivered whenever the seller has done everything necessary to be done in order to put the property completely and unconditionally at the disposal of the buyer.

Here, where an exchange of automobiles is

a part of the consideration, and the payment of money is a part also of the agreement; and nothing is said as to the time of exchange and payment, the two are concurrent acts. Howard v. Emerson (Tex. Civ. App.) 65 S. W. 382. So that, briefly stated, to have effected the sale of the automobile in this case, Shearman being the one proposing the agreement, he must have made a proposition to Lewis in some form to sell or exchange his automobile, stating the terms upon which he would do so; Lewis must then, in some form of words or acts, have accepted to buy and on the very terms proposed.

Stating the evidence as to what took place, as given by Shearman, omitting what seems to be immaterial, Shearman said:

"I told him [Lewis] about my car. He said he had been offered $200 for the wreck [the Lewis car], and I said, if they would give him $200 they would give me $200 and I would trade for it without seeing it. Shearman, at Lewis' request, took Lewis down to the Watkins Motor Company's place of business in the Shearman car, and left it there inside of run into elevator. The next time Shearman saw the Shearman car, it was in the basement. Lewis and wife had had their belongings [clothes, cooking utensils, etc.] put in the Shearman car. Shearman asked them to leave the things in the locker, and Mrs. Lewis said, 'No.' Lewis and wife then arranged with Mr. Coats to store the Shearman car until they got ready to go. Coats put the Shearman car on the far side of the basement, parked it, and gave Mrs. Lewis the keys. Then Mr. Lewis commenced on Mr. Coats for the rubber on his old car [Lewis' car]. Mr. Lewis told him that it was not his deal; that it was the deal of himself and Shearman. I said [to Coats], 'If you give him the rubber off that car, don't charge it up to me in my deal,' and I left. Later in the day Lewis and Mr. Watkins brought to Shearman transfers, one for Shearman and one for Lewis. Shearman offered his transfer to Lewis, and he refused it. Lewis wanted to know why Watkins did not make those papers [evidently referring to the transfers], and Shearman said in reply that Watkins had nothing to do with the trade. Shearman said to Lewis he would give him an extra rim, but not the extra casing and inner tube. Shearman said [the evidence does not show to whom, but most probably to Lewis and wife]: 'My car [evidently the Shearman car] was worth $800 and they only give $800 difference. * * * He [evidently Lewis] turned the wrecked car [Lewis' car] over to me. * * * We had agreed on price of $200. The car was never delivered to me. The keys to the wreck were never delivered to me. There were no keys; I never had anything; it could not be moved.'"

On cross-examination Shearman was asked to restate the deal. He said he described his (Shearman's) car to Lewis, how old the car was, about the cushions, about the rim, but told him he could not give the extra casing, and that the balance was in fine shape. Said:

"He was to pay me $800 difference, and the old car, the old car just like it stood. I said

that Mr. Coats brought this bill of sale to me; it was a transfer, not a bill of sale. I understood it was to be brought to the courthouse and signed by some clerk. * * * I had the transfers, got him (Watson) to send them, and he had them both, mine and Mr. Lewis'. When I got there [at the hospital], Mr. Lewis refused to sign the transfer. * * * He did not sign a bill of sale or anything."

When asked if he did not expect Lewis to give him some evidence of title, said:

"I did not expect that; I did not know one was necessary or not. If I did not expect him to give me some evidence of title, well, I expected him to give me $800 and it was a trade."

We have stated the above to get more fully the terms of the transaction, in determining whether a completed sale had been made of the Lewis car, the one in controversy. Without stating the evidence, the court found that Lewis did not pay the $800 to Shearman, and did not give any order, verbal or otherwise, to Watkins to turn the Lewis car over to Shearman, but that Lewis instructed Watkins not to deliver the Lewis car to Shearman, and likewise Shearman instructed Watkins not to deliver the Lewis car to Lewis, or to any one else.

We have concluded from the above that, while Shearman's proposition to Lewis to sell his car for the Lewis car and $800, as a proposition, was sufficiently clear and expressed in words, the evidence does not show that Lewis on his part, at that time, or at any time, by words accepted the proposition. The evidence shows impliedly, we think, that Lewis intended to accept, but that before the exchange of cars had been effected a controversy arose as to some parts that Lewis claimed, and nothing more was done. The money part of the consideration was never paid. From Shearman's statement, above quoted, he evidently understood that the delivery of the car and payment of the money part of the consideration were to be concurrent acts, and that, when the Lewis car was delivered and the money paid, the trade would be completed, and not until that was done.

From the above authorities, conceding that Lewis accepted the proposition to pay the $800 and that their minds met on the parts that were to be delivered with the Shearman car, we think that, until all things agreed to be done had been done, only an agreement to make the trade had been made, but that the trade as agreed had not been effected, and an actual completed sale had not been concluded. The burden was on Shearman to show that a completed sale had in fact been made to entitle him to the possession of the car.

We need not discuss the provisions of the act passed by the Thirty-Sixth Legislature at its regular session, 1919, being chapter 138, page 253 (Vernon's Ann. Penal Code

Supp. 1922, arts. 1617¾–1617¾k), or article 6685, R. C. S., as applied to this case, further than to say that the parties had bills of sale of the two cars prepared, evidently intending, as a part of the transaction, that in the event of a sale the statutes would be complied with, but that Lewis refused to sign the transfer papers when presented, and that none were ever executed by either of the parties. Had the sale been completed, the sale would not be void because the above statutes had not been complied with; but we think we may consider the fact that the parties had transfers prepared pending the sale negotiation as evidence of the intention of the parties that the statute would be complied with in the event of a sale, and that Lewis, by refusing to sign the prepared papers, ended the negotiation.

If we are not in error in holding that a sale was not effected, the evidence showing that Poe completed a purchase of the car from Lewis, he would be entitled to judgment.

The case is affirmed.